I. E. Doggett v. Commissioner. *
Doggett v. Commissioner
Docket No. 49710.
United States Tax Court
T.C. Memo 1958-176; 1958 Tax Ct. Memo LEXIS 48; 17 T.C.M. (CCH) 873; T.C.M. (RIA) 58176; September 24, 1958
*48 Daniel R. Dixon, Esq., for the petitioner. Paul J. Weiss, Jr., Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined the following deficiencies in income tax and additions to tax: Income tax
Addition to tax
Year
deficiency
Section 293(b)
1942
$ 5,495.27
$ 2,747.64
1943
13,698.52 *
6,849.26
1944
31,333.21
15,666.61
1945
14,575.62
7,287.81
1946
7,526.82
3,763.41
The disputed issues are: (1) Whether the deficiencies for the years 1942, 1944, 1945 and 1946 are barred by the statute of limitations, it being conceded by petitioner on brief that appropriate waivers were executed for the year 1943. (2) Whether petitioner's net income for each of the years 1942 through 1946 is correctly reflected by his books and records. (3) Whether petitioner suffered any loss due to embezzlement in the years 1942 through 1946. (4) Whether certain expenses attributable to petitioner's personal automobile are properly deductible as business expenses in the years 1942 through 1946. (5) Whether sums expended for flowers in the years 1942 through 1946 are *49 properly deductible as business expenses. (6) $250Whether paid in 1943 for attorney's fees is properly deductible as a business expense. (7) Whether certain debits to petitioner's drawing account in the years 1942 through 1946 represented business expenses and are properly deductible as such. (8) Whether certain storage receipts for 1946, which were reported as income by one of petitioner's corporations, are petitioner's income rather than his corporation's. (9) Whether certain expenses which were accrued by petitioner's sole proprietorship and assumed by his corporations in 1946 are proper deductions in computing his net income. (10) Whether certain sums were expended for taxes and insurance in 1946 and are therefore deductible. (11) Whether any part of any deficiency is due to fraud with intent to evade tax. Findings of Fact Some of the facts were stipulated and are found accordingly. Petitioner, a resident of Raleigh, North Carolina, had his income tax returns for the years 1942 through 1946 prepared by a certified public accounting firm on the cash basis. These returns were filed timely with the collector of internal revenue for the district of North Carolina. *50 Respondent mailed to petitioner a statutory notice of deficiency, dated April 22, 1953, with respect to these years. Petitioner operated the Strop Taxi Company in Raleigh, North Carolina, as an individual proprietorship from 1933 to April 30, 1946, when he formed two corporations, the Yellow Cab Company, Inc., and the Strop Taxi Company, Inc. Petitioner's fleet of cabs grew from 8 in 1933 to 50 at the time of incorporation. Petitioner hired Linwood T. Hobgood as a bookkeeper in April 1941. Hobgood remained employed in that capacity until February 1947. He was 26 years of age at the time he was hired and had studied bookkeeping and typing for approximately 1 year at night school. Petitioner informed Hobgood within the first year of his employment that petitioner's income was getting so large that he did not feel that he should have to pay the Government income tax on all of it. Petitioner instructed Hobgood to reduce these income taxes in any way he could. To this purpose Hobgood used a number of different methods during the years 1942 through 1946. One method used by Hobgood to conceal income was to inflate the business expenses upon posting to the ledger. For example, in the *51 months of August through December 1943, nine of the items posted to the gasoline account ledger exceeded by $100 each the amount correctly recorded in the journal. Some expense accounts were totaled before being posted, and Hobgood would overadd or overfoot these account columns in the journal and post the larger amount to the ledger. For example, the correct total of the "Parts" account in the journal for the month of October 1942 is $1,184.21; however the total recorded is $1,284.21. These footing errors in the expense accounts totaled $1,246 in 1942 and $2,895 in 1943. Hobgood credited many income items directly to petitioner's drawing account, thereby by-passing the "income" or "receipts" account. For example, income from the coca-cola machine, from the sale of book tickets, from the sale of old cabs and from the sale of junk or scrap was ordinarily credited directly to petitioner's drawing account. Checks for insurance recoveries amounting to $706.59, $703.98, and $676.50 were also so credited in 1942 through 1944, respectively. In addition, there were checks amounting to $930.41, $2,288.71, and $1,240.41 which were received from insurance and advertising companies in 1944 through *52 1946, respectively, and which were not recorded at all. Hobgood endorsed some but not all of these checks. Another method of concealing income was by recording personal expenditures as business expenses. For example, on February 5, 1945, petitioner issued a check to the Heater Well Company for $376 to pay for a well drilled on his father-in-law's farm. This expenditure was recorded in the 1945 journal as a debit to the repairs account of the taxicab business. Petitioner's business furnished gasoline and made necessary repairs to his personal automobile. This automobile was included with the business automobiles on petitioner's books for the purpose of computing depreciation. One of the principal methods used to understate taxable income during the years 1944 and 1945 was to fail to record some of the receipts in the journal after having properly recorded them in the cash book. During the years 1944 and 1945, the variance between the receipts as recorded in the journal and receipts as reflected in the cash book aggregated $27,825 and $10,025, respectively. Hobgood placed the withheld cash on petitioner's desk, after attaching an adding machine tape showing the amount of the daily *53 receipts and how much had been withheld. The adding machine tape would show a figure for the amount withheld and to the left of the figure Hobgood wrote the name "Red." Petitioner is commonly known as "Red" Doggett in Raleigh. The daily receipts were correctly recorded in the cash book, and in 1944 and 1945 a smaller amount was recorded in the journal, the difference being accounted for on the adding machine tapes. For example, the correct receipts for the "day shift" on Friday, March 30, 1945, were $391. This amount is properly recorded in the cash book. The amount recorded in the journal is $341. The difference of $50 appears on the adding machine tape opposite the word "Red." Petitioner or his wife checked the drivers' receipts almost every day. Petitioner understood the cash book. It was kept principally by Hobgood with occasional entries being made by both J. M. Neal, petitioner's personnel manager, and by petitioner. The cash book was kept for petitioner's information and was not maintained with the journals and ledgers in the filing cabinet but was kept separately in Hobgood's desk drawer. When a cash book was filled it was stored on the top shelf of a large wooden cabinet. *54 Only the journal and ledger were made available to the certified public accounting firm by Hobgood for the preparation of petitioner's income tax returns. The accountants were retained only to prepare returns and not to audit the books. The cash books were never made available to them. Petitioner accumulated the withheld cash in a safe in his office and periodically removed it. During the year 1944, petitioner made 5 deposits of currency, totaling $5,185, in his wife's account in the Security National Bank. During the year 1944, petitioner made 8 deposits of currency, totaling $6,080, in his wife's account in the Bank of Lillington. On January 19, 1945, petitioner paid $2,000 in currency to the Connell Realty and Mortgage Company as a deposit to purchase a lot, and on February 28, 1945, and March 24, 1945, petitioner made additional cash payments of $3,000 and $2,500, respectively. On February 1, 1945, petitioner paid $2,050 cash on a home. On one occasion petitioner asked Hobgood if he thought petitioner could "get away with" the understatements of income. Hobgood told petitioner that he could until the Government checked him. Petitioner did not offer Hobgood anything to falsify *55 the books nor did petitioner threaten to discharge him if he failed to comply with petitioner's instructions. Hobgood told petitioner that petitioner would have to assume full responsibility for the practice. Hobgood once cautioned petitioner that entirely too much was being withheld and that he had better go easy, to which petitioner replied that Hobgood should let petitioner worry for he was the one getting the money and that he would pay off when the time came. Petitioner's reported net income, his net income as determined by respondent in the notice of deficiency and as subsequently corrected by respondent, using the "receipts and disbursement" method, and net income as computed in petitioner's brief according to the "receipts and disbursement" method are: Net income
Net income
Net
per respondent's
as corrected
Net income per
Year
income reported
deficiency notice
by respondent
petitioner's brief
1942
$25,425.71
$34,459.92
$33,334.70
$28,623.80
1943
50,766.59 *
68,524.91 **
64,944.80
58,393.82
1944
44,573.51
84,006.49
81,383.23
66,655.19
1945
44,351.16
64,314.72
58,015.55
49,006.77
1946
15,765.54
30,702.82
31,949.49
16,480.00
*56 Petitioner computed his net income in his brief by deducting the following item from respondent's corrected net income computation: 1942
1943
1944
1945
1946
Embezzlement loss
$1,418.35
$4,095.00
$12,838.65
$7,950.59
$ 2,706.91
Personal living expenses which respondent es-
timated were paid by petitioner's business
600.00
600.00
600.00
600.00
200.00
Depreciation on personal automobile - amount
alleged by petitioner to be attributable to
business use
355.91
335.91
59.32
Gasoline for personal automobile - amount al-
leged by petitioner to be attributable to
business use
57.79
Flowers purchased by business
77.26
58.21
169.50
166.76
97.35
Attorneys fees
250.00
Storage receipts
4,880.40
Accounts payable transferred to corporations
7,144.98
Taxes and insurance
302.35
Debits to petitioner's drawing account which pe-
titioner alleges represent business expenses: Salary adjustment
6.00
Accounts receivable
9.50
4.50
1.00
Uniforms and advances
79.99
340.00
Cash receipts and expenses
1,937.85
388.56
277.81
129.45
Chicken feed
168.25
483.30
357.90
55.98
137.50
Wages - decedent
420.36
102.50
Bad check
2.50
Totals
$4,710.90
$6,550.98
$14,728.04
$9,008.78
$15,469.49
*57 Respondent also computed petitioner's net income by using the "net worth plus nondeductible expenditure" method, except for cash on hand. In doing so, respondent used as figures for petitioner's living expenses for 1945 and 1946, $20,232.26 and $20,936.94, respectively. Included in these figures are $5,284.28 and $5,734.06, respectively, which consist of cash collected and cash charged to petitioner's drawing account. When petitioner incorporated his taxi business in 1946, he transferred the following assets and liabilities to the corporations: Assets
Cash in Banks
$ 7,236.75
Accounts Receivable
201.50
Advances and Uniforms
2,079.54
Automobiles
71,664.98
Furniture, Fixtures and Equipment
7,085.13
$88,267.90
Liabilities
Notes Payable, 1st Citizens Bank
$ 649.25
Notes Payable, Encyclopedia Bri-
tannica
414.16
Employees' F.O.A.B. Victory Tax
626.47
Reserve for Depreciation
63,933.04
Accounts Payable
7,144.98
Capital Stock, Yellow Cab, Inc. &
Strop Taxi, Inc.
15,500.00
$88,267.90 There was an additional liability of $5,813.83 for wages which accrued prior to the date of incorporation. An adjusting entry was made on the books of the corporation *58 at the end of their fiscal years, April 30, 1947, crediting expense and debiting petitioner's account for this sum. During 1946 Yellow Cab Company, Inc., conducted its business without a lease and without payment of rent on real estate owned by petitioner. It reported $7,320.60 as income in 1947 for storage rentals which were received by petitioner personally between September 6, 1946 and February 4, 1947. This income belonged to petitioner and he owed no part of it to either of his corporations in 1946, because petitioner, and not his corporations, rented the real estate for storage purposes. Petitioner's net income, determined by computing the increase in net worth plus nondeductible expenditures, without considering unstipulated additional living expenses for 1945 and possible increases in cash on hand, was not less than $30,955.79, $62,019.04, $68,544.58 and $50,064.96 for the years 1942 through 1945, respectively. During the years 1942 through 1946, petitioner maintained a safety deposit box at the Wachovia Bank & Trust Company in Raleigh, North Carolina. During the initial stages of the investigation, on Friday, May 9, 1947, at approximately noon, respondent's revenue agent *59 asked petitioner if he would accompany the agent to the Wachovia Bank & Trust Company to inventory the contents of petitioner's safety deposit box. Petitioner informed the agent that he could not leave his place of business. An appointment was made to inventory the contents of petitioner's box on the following Monday, May 12, 1947, and no cash was found. Petitioner entered his safety deposit box less than an hour after the agent left his place of business on Friday, May 9, 1947. On February 21, 1951, petitioner pleaded nolo contendere to and was convicted on a 3-count indictment charging the filing of false and fraudulent income tax returns with intent to evade for the years 1944 through 1946. On April 6, 1951, petitioner was fined $30,000 and the costs of prosecution. Petitioner's returns for each of the years 1942, 1944, 1945 and 1946 were false and fraudulent with intent to evade tax; and some part of each of the deficiencies in income tax for the years 1942 through 1946 was due to fraud with intent to evade income tax. Opinion After this case had been heard but before it could be decided, the judge who had presided at the trial died. The parties were given an opportunity *60 to apply for a further hearing. [1] In the event that either considered it necessary for the deciding judge to see and hear the witnesses, they could have done so. No such application has ever been made in all the time that has elapsed since that opportunity was tendered. Nevertheless, the entire proceeding reduces to an irreconcilable conflict of testimony. [2] Petitioner accuses his bookkeeper of continuous and systematic embezzlements from petitioner's business. The bookkeeper categorically denies any misappropriations. He testified that petitioner instructed him to falsify the business records thereby reducing petitioner's apparent taxable income, and that the difference largely went to petitioner in cash. This account, naturally, is contradicted by petitioner's testimony. *61 Both versions, of course, cannot be true. Our primary responsibility is thus to marshal that arrangement of the facts, as they appear in the written record, which seems to us most nearly to accord with what actually happened. Our findings, which are dispositive of most of the issues, reflect the conclusion that the statements of the bookkeeper rather than those of petitioner are entitled to credence. This result has been reached on the whole record and for a number of reasons, among which are the following: First, the bookkeeper has no such apparent interest in the outcome as has petitioner. No charges against him are, or for all that appears, ever have been pending against him. [3] Any motive for departing from the truth would hence tend to tip the balance in favor of the bookkeeper's veracity. Second, petitioner's conviction on his plea of nolo contendere is at least a sufficient justification for doubting the truth of his statements. , affd. (C.A. 5) . Third, the other evidence, including testimony of presumably unbiased witnesses, supports for the most part the bookkeeper's statements. Fourth, the conceded *62 understatements of income, [4] even on petitioner's "net worth" computations, [5] are so large for the period 1942 through 1945 that petitioner must have been aware of them and even without more they thus tend to support respondent and his witness and to lead to an inference of fraud which agrees with their theory. . The socalled "routine adjustments" do not by any means account for the difference nor rebut the evidence of guilt, even if they should, as petitioner contends, fail to add to implications of dishonesty. *63 There is a great deal of testimony as to whether it was petitioner or his accountant who finally produced the significant [6] cash books. We have made no finding on this point in view of the hopeless conflict of testimony. But one aspect of the case which petitioner makes no effort to justify is that the revenue agent had been working on the case for several weeks. Admittedly petitioner called in no outside assistance until at the conclusion of the examination a deficiency was proposed. Admittedly also, until this moment no offer of the cash books had been made to the examining agent. Yet on petitioner's own theory this was the one kind of book with which he was familiar. Why were they withheld throughout the investigation? And who but petitioner could have withheld them? There are, to be sure, discrepancies in the testimony of both principal witnesses. This is not surprising with reference to events by *64 now much more than 10 years old. But the principal charges made by the bookkeeper are credible and consistent and we find no such infirmity in them as to require their complete repudiation. [7]
This is not a case where any question of burden of proof can successfully be raised. Cf. . Once the bookkeeper is believed as to petitioner's obeyed instructions to falsify the books in order to understate income, all the proof of fraud necessary is furnished. , affirmed per curiam (C.A. 2) , certiorari denied ; . The situation as to the year 1946 is somewhat different. The admitted understatement of income for that year is so small that possibly were it the sole evidence of fraud we should be inclined to hold that respondent *65 had failed to sustain his burden. But in the context of all that had previously transpired, including the pattern of fraud for the prior years, Hobgood's continuing concealment under petitioner's instructions and the failure of petitioner to make any effective rebuttal of respondent's evidence, we think it would be impossible to conclude that fraud had not been proved for the year 1946 as well as for each of the preceding 4 years. Respondent's burden of proving fraud having been satisfactorily met for all of the years, the proposed deficiencies are not barred by the statute of limitations. The burden of proving error in the deficiencies determined consequently rests upon petitioner. . Petitioner relies heavily on the net worth computation of income to show that at least some funds were embezzled and that his income was not as large as contended by respondent. Although the parties have stipulated petitioner's net worth to a large degree there were no figures for cash on hand in any of the years, and this item was expressly left open for proof. Respondent having proved fraud in each of the years, the burden is upon petitioner to prove *66 error in the deficiency notice. Petitioner has admitted to keeping cash on hand and has failed to prove that this did not increase in each of the years in issue. He has accordingly not proved that his income for these years is correctly reflected by the net worth computation. Respondent relies on the "receipts and disbursements" method to verify his deficiency determination. Petitioner has not shown that this method is less accurate than the net worth method. To the contrary, all of the evidence tends to indicate that respondent's computation of receipts and disbursements is the more precise method and should therefore be accepted. See . In addition to the net worth computation, petitioner uses two approaches to attack respondent's computations - his personal testimony and cross-examination of respondent's agent. Since we consider petitioner's testimony unworthy of belief, we have no evidence that petitioner suffered embezzlement losses and therefore no deduction of this nature may be allowed. There is likewise no evidence that the expenses relative to his personal automobile and the flowers are ordinary and necessary expenses of his *67 business, and no proof that respondent's estimate of the personal expenses of petitioner which were paid by his business is in error. It is impossible to conclude from the record that any part of the "debits to drawing account" represent deductible expenses. Although the attorney fees might well be deductible if they were in fact expended for the purpose assumed by respondent's revenue agent, his examination is hardly proof of the nature and payment of the expense, and the same may be said in regard to the agent's testimony in regard to the item of "taxes and insurance." The attorney, to whom the fee was allegedly paid, was called as petitioner's witness and yet no attempt was made to elicit testimony on this point. The facts found involving the storage receipts in 1946 show that petitioner, and not his corporations, earned and received that income. Petitioner's contention that the transfer of accounts payable to his corporations in the same year constitutes payment of an expense, or that payment was made by the corporations as his agent, cannot be sustained even if it may be assumed that these accounts payable represent expenses which might be deductible. Petitioner, a cash basis *68 taxpayer, did not pay the expenses in 1946. There being no evidence that petitioner was in the taxi business subsequent to the incorporation, he cannot be said to have been doing business through an agent. . The increased deficiency for that year, however, must be disapproved even if it could be said that this was validly claimed. As to this, the burden was on respondent and we find no adequate evidence to sustain his position as to the claimed increase. Petitioner, having failed in his burden of proof, the deficiencies as determined are sustained, except as respondent has conceded smaller deficiencies for 1942 through 1945. And for the reasons already stated, the additions to tax for each year are likewise approved. Decision will be entered under Rule 50. Footnotes
*. Note: This case was heard by Judge Stephen E. Rice and briefs were duly filed. After his death on February 9, 1958, the case, not having been disposed of, was reassigned to Judge Clarence V. Opper, and notice was given to the parties that any motions contemplated in connection with the proceeding should be addressed to Judge Opper and filed immediately, and that if no such motions were received within 30 days he would proceed with the disposition of the proceeding. No motions requesting rehearing or further hearing or relating in any other manner to this case have been received.↩
*. Includes Victory tax.↩
*. Victory tax net income reported in 1943 - $53,069.67. ↩
**. Victory tax net income per deficiency letter - $70,364.73.↩
1. "Judge Stephen E. Rice, to whom this proceeding was formerly assigned, having died on February 9, 1958, notice is hereby given that this proceeding will be reassigned to Judge Clarence V. Opper. "It is not anticipated that any rehearing or reargument will be necessary in connection with this proceeding, since the entire file and record herein, together with briefs, are being transferred to Judge Opper. However, should any motions be contemplated in connection with this proceeding they should be addressed to Judge Opper and be filed immediately. If no such motions are received within 30 days, Judge Opper will proceed with the disposition of this proceeding." ↩
2. "Respondent states that either Hobgood or petitioner is a liar. To this, petitioner agrees wholeheartedly." (Petitioner's reply brief, p. 54.)↩
3. Petitioner states in his brief (p. 32) that "[it] is to be borne in mind that the full disclosure of the extent of the embezzlement has only been discovered in preparing data for this proceeding." Petitioner quotes from the General Statutes of North Carolina and concludes "it is apparent that a prosecution for embezzlement may be initiated in North Carolina at any time after the offense has been committed." At the trial Hobgood gave the following answers to respondent's questions: "Q. Now, did you personally appropriate any of the money which you withheld for Doggett? "A. No, sir. "Q. Has Doggett ever accused you of doing so? "A. No, sir. "Q. Before this trial? "A. No, sir. "Q. Has he ever preferred criminal charges against you in any court? "A. No, sir. "Q. Has he ever brought any civil action against you seeking to recover any sum? "A. No, sir. "Q. Have you ever been convicted of a felony or a misdemeanor? "A. No, sir." ↩
4. These understatements are set forth in petitioner's reply brief (p. 64) as follows: Net Worth
Statement
Per Return
Per Petitioner
1942
$25,425.71
$30,955.79
1943
50,766.59
62,019.04
1944
44,573.51
68,544.58
1945
44,351.16
50,064.96 According to these figures petitioner's understatement of net income in each of the years 1942 through 1945 is $5,530.08, $11,252.45, $23,971.07 and $5,713.80, respectively. The 4-year total of income per return, income per net worth statement, and understatement of income is $165,116.97, $211,584.37 and $46,467.40, respectively. ↩
5. "It is further maintained that the net worth statement provides the only reliable determination of the incomes of the petitioner for the years involved." (Petitioner's brief, p. 102.)↩
6. "Petitioner's position in respect to the fares reported in the cash book but not reported in the journal has been extensively developed. This item in the amount of $14,992.41 is the most important single item in this entire proceeding." (Petitioner's reply brief, p. 71.)↩
7. Even if we assume on this branch of the case that some of the proceeds of the large understatements stuck to the bookkeeper's fingers, that would not be inconsistent with petitioner's fraud. Only if all of it was taken without petitioner's knowledge would the bookkeeper's testimony fail.↩